# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Carl Steinhoff,                                    :        Case No. 1:13CV2310

      Plaintiff,                              :

vs.                                                :

                                            **MEMORANDUM AND**

Commissioner of Social Security Administration,    :        **ORDER**

      Defendant.                             :

Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381, *et seq*. and 405(g).  Pending are briefs on the merits filed by both parties (Docket Nos. 16 & 17).  For the reasons set forth below, the Magistrate affirms the decision of the Commissioner.

## I.  PROCEDURAL BACKGROUND

On June 23, 2010, Plaintiff filed for SSI and Disability Insurance Benefits (DIB), alleging disability beginning November 16, 1999 (Docket No 12, pp. 221-228 of 483).  Plaintiff's claims were denied on February 14, 2011, and upon reconsideration on June 27, 2011 (Docket No. 12, pp.153; 160; 167; 173 of 483).  Plaintiff filed a written request for a hearing on July 7, 2011 (Docket No. 12, p. 180 of 483).  On May 22, 2012, Administrative Law Judge (ALJ) C. Howard Prinsloo presided over a hearing from St. Louis, Mo, at which Plaintiff, represented by counsel Michelle McFarland appeared and testified via video teleconference, and Vocational Expert (VE) Steven P. Davis, appeared and testified by telephone (Docket No. 12, p. 29 of 450).  At

the outset of the hearing, the ALJ indicated the case was before him as a concurrent Title II and Title XVI case, but noted, with the agreement of Plaintiff's counsel, that he was barred by an ALJ's prior decision, from considering the Title II claim (Docket No. 12, p. 39 of 483).  Proceeding solely on the SSI claim, Plaintiff's counsel amended Plaintiff's onset date to June 22, 2010 (Docket No. 12, p. 41 of 483).   The ALJ issued an unfavorable decision on June 26, 2012 (Docket No.12, pp. 12-28 of 483 ).  The Appeals Council denied review of the ALJ's decision on August 26, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 5 of 483).

## II. FACTUAL BACKGROUND

### A.    ADMINISTRATIVE HEARING

#### 1.    PLAINTIFF'S TESTIMONY

Plaintiff gave testimony that he suffers from Depression, Bipolar Disorder, and headaches stemming from a work related accident in 1993, in which his left orbital, nasal passage and jaw were shattered by a sledge hammer (Docket No. 12, pp. 45; 50 of 483).  Plaintiff also complained of left arm pain from a stabbing injury in which he had to have muscles removed from his left arm (Docket No. 12, pp. 45-46 of 483).  In addition, Plaintiff testified that he suffers from arthritis in both of his hands and is unable to grab and hold items in his left hand, such as a gallon of milk or a cup of coffee (Docket No. 12, p. 46 of 483).  Plaintiff gave testimony that he cannot walk far before experiencing pain in his legs, his back hurts if he sits down too long, and that he tries to alleviate his pain by lying down or sitting until he gets comfortable (Docket No. 12, p. 49 of 483).

When asked about his Bipolar Disorder and Depression, Plaintiff indicated he is irritable, suffers mood swings, and avoids social interactions since having been on workman's compensation for his sledgehammer injury (Docket No. 12, pp. 49-50 of 483).  Plaintiff noted having last been treated with medications including Zoloft and Cymbalta, a year ago, but that they had too many side effects (Docket No. 12, pp. 50-51 of 483).  Plaintiff identified his Bipolar Disorder and Depression as the one thing preventing him from working (Docket No. 12, p.

2

53 of 483).  Plaintiff noted that his most serious physical problem is dizziness and pain in his left arm and head (Docket No. 12, pp. 53-54 of 483).

During questioning from the ALJ, Plaintiff described past work with KAL Construction, Ameriwaste Environmental Services, Western Water Proofing, and Ram Construction before becoming self-employed and performing odd jobs in 2003 (Docket No. 12, pp. 55-58 of 483).  Despite earnings of approximately $17,000 in 2009, Plaintiff repeatedly insisted that he did not know the source of that income since he had not filed taxes or worked a full time job (Docket No. 12, pp. 58-61 of 483).  When Plaintiff was self-employed, he testified that he did interior or exterior painting of private homes and some landscaping (Docket No. 12, p. 63 of 483).

### 2.      VE TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background before the hearing, the VE described Plaintiff's past work as: water proofer, DOT[1] 869.664-014, at a specific vocational preparation (SVP)[2] of 2, and medium exertion; painter's helper, DOT 869.687-026, unskilled at a SVP of 2, performed at light, and classified at very heavy; laborer, DOT 922.687-058, unskilled at a SVP of 2, classified as medium, and performed at heavy; construction worker, DOT 869.664-014, semi-skilled with a SVP of 4, classified at heavy, and performed at heavy; chemical operator II, DOT 558.685-062, semi-skilled at 4, classified at medium, and performed at either sedentary or light (Docket No. 12, pp. 67-68 of 483).

ALJ Prinsloo then posed his only hypothetical question:

> I want you to assume you're dealing with an individual who is the same age as the claimant.  He's now 54 with the same high school educational background and the same past work experience.  I'd like you to further assume that this individual retains the residual functional capacity for light

---

[1]  Dictionary of Occupational Titles ("DOT")

[2]  SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

work. He cannot climb ladders, ropes or scaffolds or work at unprotected heights. He's limited to occasional fine manipulation with his hands bilaterally limited to simple repetitive tasks, low stress work, involving no more than limited interaction with coworkers and no interaction with the public.

(Docket No. 12, p. 69 of 483). Taking into account these limitations, the VE testified that such an individual would be unable to perform any of Plaintiff's past work (Docket No. 2, p. 70 of 483). When asked if the hypothetical individual could perform any other work, the VE provided a list of jobs including surveillance systems monitor, DOT 379.367-010, unskilled at a SVP of 2, of sedentary exhaustion, in which there are 200,000 such jobs nationally and approximately 6,000 jobs in the State of Ohio; sealing and canceling machine operation, DOT 208.685-026, unskilled at a SVP of 2, light duty, in which there are 100,000 such jobs nationally and 1,500 in the State of Ohio; wing mailer-machine operator, DOT 208.685-034, an unskilled position at a SVP of 2, light duty, in which there are 101,000 such jobs nationally and about 1,600 jobs in the State of Ohio; coin machine collector, DOT 292.687-010, an unskilled position at a SVP of 2, light duty, in which there are 250,000 such jobs nationally and 15,000 jobs in the State of Ohio (Docket No. 12, pp. 70-73 of 483).

The ALJ then asked the VE to consider jobs identified at Plaintiff's previous hearing, first asking about the position of gasket inspector, DOT 739.687-102, which the ALJ indicated would be inappropriate given the frequent use of fingers (Docket No. 12, pp. 73; 89 of 483). Next, the ALJ inquired about the position of hand packer, DOT 920.587-018, which the VE noted would not be appropriate given the constant use of fingers (Docket No. 12, pp. 73-74; 89 of 483). Finally, the ALJ asked about the position of laundry worker 3, DOT number 369.387-010, and the VE indicated it would be inappropriate (Docket No. 12, pp. 74; 89 of 483).

## B.   MEDICAL RECORDS

Summaries of Plaintiff's medical records, to the extent that they are necessary and relevant to the issues before this Court, follow.

### 1.   EMERGENCY DEPARTMENT - METROHEALTH SYSTEM

- On September 7, 2001, Plaintiff complained of an injury to his right elbow after "wrestling with guards" approximately four days earlier.  Plaintiff rated the severity of his pain at a three out of ten, which was aggravated by applying pressure on the injured area.  He was examined by Dr. Jeffrey E. Pennington, M.D. and diagnosed with a sprained right elbow after x-rays taken of his elbow and forearm were negative (Docket No. 12, pp. 412-414; 436-438 of 483).

- On March 24, 2005, Plaintiff complained of intermittent numbness and tingling, left arm and neck pain radiating to his hand, which was aggravated by laying on his side and using the arm. Dr. Kristen Schmidt, M.D. ordered Plaintiff to undergo an Electrocardiogram (EKG) and prescribed him Percocet[3] and Ibuprofen (Docket No. 12, pp. 407-411 of 483).

- On May 22, 2005, Plaintiff was evaluated after falling from a ladder and  suffering a laceration to his first finger on his right hand.  An x-ray of Plaintiff's fingers found soft tissue defect of the distal index finger and soft tissue swelling overlying the proximal interphalageal (PIP) joint of the index finger (Docket No. 12, pp. 434-436 of 483).

- On May 24, 2005, Plaintiff was seen for a wound check of his right finger and complained that the pain was getting worse. He was prescribed Darvocet[4] and Keflex[5] and discharged (Docket No.12, pp. 402-406 of 483).

- On August 16, 2005, Plaintiff  complained of a back injury after lifting objects for his sister on the previous day. After examination,  Dr. Scott M. Sundheim prescribed Percocet, Ibuprofen and referred Plaintiff to his primary care physician (Docket No. 12, pp. 396-401 of 483).

- On November 10, 2005, Plaintiff went to the Emergency Room for treatment of a laceration on his head stemming from an assault the previous evening in which he was hit in the head and complained of left shoulder and neck pain.  An x-ray taken of Plaintiff's shoulder reported no evidence of acute traumatic injury to his shoulder, noted degenerative changes of the AC joint, some soft tissue injury or hematoma, and remote healed rib fractures (Docket No. 12, pp. 433-434 of 483).

- On November 29, 2005, Plaintiff complained of a left arm fracture sustained in Florida. An x-ray

---

[3] Percocet is a medication used to relieve moderate to severe pain and contains oxycodone, a narcotic pain releaver, and acetaminophen, which is a non-narcotic pain reliever. *Percocet oral: Uses, Side Effects, Interactins, Pictures, Warnings, & Dosing*, WEBMD, (July 22, 2014, 10:04 AM), http://www.webmd.com/drugs/drug-7277-Percocet+Oral.aspx?drugid=7277&.

[4] Darvocet is a pain medication, which was banned by the Food and Drug Administration in November 2010, due to side effects. *Darvon, Darvocet Banned*, WEBMD, (July 22, 2014, 10:09 AM), http://www.webmd.com/pain-management/news/20101119/darvon-darvocet-banned.

[5] Keflex is a medication prescribed to treat bacterial infections. *Keflex oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 22, 2014, 10:11 AM), http://www.webmd.com/drugs/drug-6859-Keflex+Oral.aspx?drugid=6859&drugname=Keflex+Oral.

5

revealed a mid shaft fracture of Plaintiff's left forearm, cortical irregularity of the fifth metacarpal head,[6] and a lucency was seen through the base of the fifth proximal phalanx[7] which could represent a fracture of indeterminate age and correlation with patient's pain was recommended (Docket No. 12, pp. 429-430 of 483).

- On December 19, 2005, Plaintiff visited the Emergency Department to have his cast removed from his left forearm and for rating information and pain control. Dr. Sandra L. Najarian's found that Plaintiff's fracture had not yet healed and prescribed Percocet tablets and discharged him (Docket No. 12, pp. 390-394 of 483).

- On December 27, 2005, Plaintiff went to the Emergency Department complaining of forearm pain stemming from his forearm fracture and requested additional pain medication. Dr. Raymond W. Liu, M.D., evaluated Plaintiff and advised that Tylenol #3 should be sufficient for his pain and discharged him (Docket No. 12, p. 388 of 483).

- On October 24, 2006, Plaintiff presented himself complaining of right sided chest pain and right arm numbness and tingling. Dr. Thomas A Waters diagnosed him with atypical chest pain. Plaintiff underwent blood testing, x-rays, and was given aspirin, morphine and Nitroglycerine SL[8] (Docket No. 12, pp. 365-382 of 483).

- On October 25, 2006, Plaintiff had a cardiac stress test. Dr. Robert C. Bahler, M.D., reported that the' results were normal without evidence of stress induced ischemia[9] (Docket No. 12, pp. 421-424 of 483). A chest x-ray dated October 24, 2006, indicated that Plaintiff had mild thickening and mild blunting of the left costophrenic angle[10] (Docket No. 12, p. 425 of 483). Another x-ray report from above the lung revealed no evidence of pulmonary embolus, infiltrate, or aortic dissection

---

[6] The fifth metacarpal bone refers to the bone of the "pinky" finger which located in the hand. *See 5th Metacarpal Graphic*, Univ. Of Kan. Med. Ctr., (July 22, 2014, 10:25 AM), http://classes.kumc.edu/sah/resources/handkines/bone/5mc html.

[7] The fifth proximal phalanx is a reference to bone in the "pinky" finger. *See Fifth Proximal Phalanx Epiphyseal Fracture*, Family Practice Notebook, (July 22, 2014, 10:17 AM), http://www.fpnotebook.com/ortho/Hand/FfthPrxmlPhlnxEphyslFrctr htm.

[8] Nitrogycerin SL is a medication used before engaging in physical activities to prevent chest pain and may be used to relieve chest pain once it occurs. *Nitroglycerin sublingual: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WebMD, (July 22, 2014, 10:20 AM), http://www.webmd.com/drugs/drug-6928-nitroglycerin+SL.aspx?drugid=6928&drugname=nitroglycerin+SL.

[9] Ischemia is the term used to describe what happens when the heart muscle does not get enough oxygen. *Ischemia - Topic Overview*, WebMD, (July 22, 2014, 10:30 AM), http://www.webmd.com/a-to-z-guides/ischemia-topic-overview.

[10] The costophrenic angle refers to the angle between the diaphragm and the chest wall at the bottom of the lung. *Costophrenic angle*, Mosby's Med. Dictionary, (July 22, 2014, 10:40 AM), http://medical-dictionary.thefreedictionary.com/costophrenic+angle.

and mild subsegmental atelectasis[11] within the left lower lobe (Docket No. 12, p. 426 of 483).

- On May 28, 2009, Plaintiff presented himself complaining of right hip and left rib pain after falling from a step ladder. Dr. Jon W. Schrock, M.D. ordered x-rays which revealed no acute fracture or dislocation of Plaintiff's chest or hip, but that he had chronic obstructive pulmonary disease (COPD) (Docket No. 12, pp. 417-419; 469 of 483).

- On September 29, 2009, Plaintiff complained of lower back and right foot pain after falling on stairs. Plaintiff was described as ambulating without difficulty. The result of the x-rays were negative (Docket No. 12, pp. 415-416 of 483).

## 2. OFFICE TREATMENT RECORDS - METROHEALTH SYSTEM

- On December 5, 2005, and approximately two weeks after his initial forearm injury, Plaintiff's left forearm fracture was evaluated by Dr. Geoffrey H. Buncke, M.D. The results of Plaintiff's x-rays noted a reduction in the fracture and Dr. Buncke recommended that Plaintiff remain in a cast for approximately four-to-five weeks to prevent rotation of the fracture (Docket No. 12, p. 395 of 483).

- On January 16, 2006, and approximately eight weeks after his initial forearm injury, Plaintiff's forearm fracture was evaluated by Dr. Bret T. Kean, M.D. Plaintiff had mild wrist stiffness, full hand range of motion, and x-rays of Plaintiff's forearm noted interval progression in healing and no change in position or alignment (Docket No. 12, pp. 386; 428 of 483).

- On March 9, 2006, Plaintiff visited Dr. Ehsan Alam, M.D. and complained of having aggravated his chronic back pain on March 6, 2006, while helping his daughter move a heavy sofa. Plaintiff reported his chronic back pain dated back to the 1970s when he fell from a tree. Plaintiff indicated that he was medicating with Percocet and Motrin, which was helping, and rated his pain a nine out of ten. Plaintiff was diagnosed with an acute back sprain and Dr. Alam opined that Plaintiff had lumbar spondylosis as well. Plaintiff was given a limited supply of Percocet for his flare up and counseled that he was not going to be continuously treated for his back pain with opioids (Docket No. 12, pp. 383-384 of 483).

- On November 15, 2006, Plaintiff saw Dr. Farooq M. Ahmed, M.D., complaining of pain on the left side of his face. Plaintiff was referred to the pain clinic and prescribed Percocet (Docket No. 12, pp. 362-364 of 483).

- On December 1, 2006, Plaintiff presented himself to Dr. Kareti Mohan, M.D. complaining of pain on the left side of his face, which was described as stabbing and throbbing involving the entire left side from his eyebrow to jaw. It was noted that the pain is relieved with Percocet and that Plaintiff had tried injections with limited success. Dr. Mohan's notes indicate Plaintiff was positive for depression, but his ability to stand, sit and walk were described as unremarkable. The treatment

---

[11] A subsegmental atelectasis is a collapse of the portion of the lung . *See Subsegmental Atelectasis,* MEDILEXICON, (July 22, 2014, 10:50 AM), http://www.medilexicon.com/medicaldictionary.php?t=8246.

plan recommends a stellate ganglion block[12] vs sphenopalatine ganglion block[13] vs radio frequency ablation (RFA)[14] (Docket No. 12, pp. 359-360 of 483).

- On January 9, 2007, Plaintiff was evaluated by Dr. Rahim Rahman, M.D. and complained of pain in the left side of his face, which was described as a stabbing and throbbing sensation involving the left side from his eyebrow to jaw, relieved with percocet pain medication.  A review of symptoms indicated Plaintiff was positive for depression, his duration for standing, sitting and walking were noted as unremarkable and he denied problems sleeping.   The treatment recommended was that Plaintiff continue his medications,  reference toxicology screens, and plan for a left stellate ganglion block (Docket No. 12, pp. 356-358 of 483).

- On January 30, 2007, Plaintiff complained to Dr. Rahman of left face pain unchanged since the previous visit.  He reported some improvement for a couple of days with left stellate ganglion block.  Dr. Rahman treatment included reinforcing the importance of back protection and a regular program to improve strength and flexibility and to repeat the stellate ganglion block on his left side a few times (Docket No. 12, p. 354 of 483).

- On February 27, 2007, Plaintiff was evaluated by Dr. Brandan Astley, M.D. and complained of left facial pain, which had improved after an injection for approximately two days before returning to its present condition.  Plaintiff reported pain in his upper arm with occasional numbness in his left hand.   The importance of back protection and a regular program to improve his strength and flexibility was reiterated to Plaintiff, and he was advised to repeat the left stellate ganglion RF, continue his Percocet medication as before, consult with Dr. Keith and quit smoking (Docket No. 12, pp. 352-353 of 483).

- On March 27, 2007, Plaintiff was seen by Dr. Jennifer Eismon, M.D. and complained that since his previous visit, his left sided facial pain had  gradually worsened and was currently sharp, stabbing, and pulsating continuously.  The pain was described as chronic and radiating to left neck.  Forward flexion, lateral flexion, rotation, sitting and standing were all documented as aggravating the pain.  Plaintiff was referred to Dr. Keith and neurology service, and his Percocet medication

---

[12]  The stellate ganglion is a collection of nerves located in the neck, which are part of the sympathetic nervous system and supply the face and arm.  A stellate ganglion block is pain-relieved medicine that is injected into the region where the ganglion is located. *Stellate Ganglion Blocks*, CEDARS-SINAI MED. HOSPITAL, (July 22, 2014, 11:00 AM), http://www.cedars-sinai.edu/Patients/Programs-and-Services/Pain-Center/Head-and-Neck-Pain/Stellate-Ganglion-Blocks.aspx.

[13]  The sphenopalatine ganglion is a collection of nerves which is located in a bony cavity referred to the pterygopalatine fossa, which is located deep in the midface.  A sphenopalatine gangion block is a pain-relieving medicine which is injected into the location where the ganglion lies. *Sphenopalatine Blocks*, CEDARS-SINAI MED. HOSPITAL, (July 22, 2014, 11:03 AM), http://www.cedars-sinai.edu/Patients/Programs-and-Services/Pain-Center/Head-and-Neck-Pain/Sphenopalatine-Blocks.aspx.

[14]  A Radiofrequency ablation (RFA) is a procedure used to reduce pain in nerve tissue for patients with chronic low back and neck pain. *Radiofrequency Ablation for Arthritis Back, Neck, and Joint Pain*, WEBMD, (July 22, 2014, 11:07 AM), http://www.webmd.com/pain-management/radiofrequency-ablation.

was continued (Docket No. 12, pp. 349-350 of 483).

- On April 6, 2007, Plaintiff sought a consultation with Dr. Shailaja Srinath, M.D. regarding pain, tingling, and numbness that he was experiencing in his left arm stemming from falling in the shower and fracturing his left forearm. Dr. Srinath's diagnosed Plaintiff with neuropathic pain in his left arm, secondary to trauma in the past, and defective fracture healing in the left forearm. Plaintiff was prescribed Neurontin[15] and it was noted that he would be seeing an orthopedic physician (Docket No. 12, pp. 345-347 of 483).

- On August 16, 2007, Plaintiff presented himself to Dr. Zahra Merchant, M.D. complaining of left upper extremity pain. A prior stabbing in his left arm was documented in 1995. Over the previous two weeks, it was noted that Plaintiff had experienced sharp, shooting pain from his left shoulder to his wrist causing him to loose grip strength and drop objects. Plaintiff's pain was documented as intermittent, but occurring at least one-to-two times a day. On a scale of ten, Plaintiff rated his pain at an eight or a nine. Dr. Merchant recommended Plaintiff undergo occupational therapy, an ultasound, deep heat to his left shoulder, and prescribed Voltaren[16] (Docket No. 12, pp. 330-331 of 483).

- On November 1, 2007, Plaintiff visited Dr. Laura Hallak, M.D, complaining of a runny nose, congestion, and having a productive cough for the previous week, which made his facial pain worse. It was noted that Plaintiff receives monthly shots, had been taking Percocet for pain since 2005, and included a referral for pain management for the following month (Docket No. 12, pp. 327-328 of 483).

### 3.    OFFICE TREATMENT RECORDS - DR. JOHN H. NICKELS, M.D. - CLEVELAND BACK & PAIN MANAGEMENT CENTER, INC.

On January 20, 2010, Plaintiff presented himself for a follow up after having fallen on some steps, twisting his right knee and landing on his back. The notes reflect Plaintiff had previously reported left facial, neck shoulder and arm pain, which he rated at a nine out of ten. Plaintiff reported the medication helped his pain, but

---

[15] Neurontin is used to relieve nerve pain. *Neurontin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 22, 2014, 11:11 AM), http://www.webmd.com/drugs/mono-8217-GABAPENTIN+ - +ORAL.aspx?drugid=9845&drugname=neurontin.

[16] Voltaren is an anti inflammatory medication. *Voltaren oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 22, 2014, 11:15 AM), http://www.webmd.com/drugs/drug-54-oltaren+Oral.aspx?drugid=54&drugname=Voltaren+Oral.

that he had run out of his medications.  Plaintiff was prescribed Medrol,[17] Lortab,[18] Ultram,[19] and Flexeril[20]

(Docket No. 12, p. 464 of 483).

### 4. OFFICE TREATMENT RECORDS - NORTHCOAST HEALTH MINISTRY

- On April 1, 2011, Plaintiff had an initial consultation.  The treatment notes document a history of depression and anxiety.  Plaintiff complained of left facial and arm pain, chronic neck pain, and sleep difficulty due to the pain.  Plaintiff was diagnosed with depression and anxiety, chronic pain, and hyperglycemia.  Plaintiff was prescribed Cymbalta,[21] Neurontin, referred to a counselor, and physical therapy by Dr. Colleen Clayton, M.D. (Docket No.12, pp. 482-483 of 483).

- On May 6, 2011, Plaintiff followed up regarding his lab results and pain.  Plaintiff complained that Neurontin was not helping and that he was taking Cymbalta.  Plaintiff's treatment notes indicate that he had improved affect since his previous visit and made eye contact.  Plaintiff's assessment reflects Dr. Tomiak's diagnosis as chronic pain syndrome, a prescription for Vicodin,[22] and referrals to the metro pain clinic and for a colonoscopy (Docket No. 12, pp. 479-480 of 483).

- On August 31, 2011, Plaintiff complained of chronic pain in his back, face, hands and knees.  Upon examination, Plaintiff had prominent PIP and distal interphalangeal (DIP) joints.  Plaintiff was

---

[17]  Medrol is used to treat arthritis. *Medrol oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WebMD, (July 23, 2014, 1:05 PM), http://www.webmd.com/drugs/drug-6469-Medrol+Oral.aspx?drugid=6469&drugname=Medrol+Oral.

[18]  Lortab is a medication prescribed to relieve moderate to severe pain and contains the narcotic pain reliever hydrocodone and non-narcotic pain reliever acetaminophen. *Lortab Elixir oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WebMD, (July 23, 2014, 1:08 PM), http://www.webmd.com/drugs/drug-78569-Lortab+Elixir+Oral.aspx?drugid=78569&drugname=Lortab+Elixir+Oral.

[19]  Ultram is prescribed for moderate to moderately severe pain. *Ultram oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WebMD, (July 23, 2014, 1:11 PM), http://www.webmd.com/drugs/drug-11276-Ultram+Oral.aspx?drugid=11276.

[20]  Flexeril is prescribed to treat muscle spasms. *Flexeril oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WebMD, (July 23, 2014, 1:13 PM), http://www.webmd.com/drugs/drug-11372-Flexeril+Oral.aspx?drugid=11372.

[21]  Cymbalta is an antidepressant medication used to treat depression and other mental or mood disorders. *Cymbalta oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 22, 2014, 11:18 AM), http://www.webmd.com/drugs/drug-91491-Cymbalta+Oral.aspx?drugid=91491.

[22]  Vicodin is a medication which consists of the narcotic pain reliever hydocodone, and acetaminophen, a non-narcotic pain reliever.  Vicoodin is prescribed to relieve moderate to severe pain. *Vicodin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 22, 2014, 11:22 AM), http://www.webmd.com/drugs/drug-3459-Vicodin+Oral.aspx?drugid=3459.

diagnosed with chronic pain syndrome and arthritis and prescribed Naproxen,[23] Vicodin, Viagra and referred for an arthritis panel (Docket No. 12, pp. 477-478 of 483).  The results of the arthritis panel performed October 14, 2011, revealed a negative rheumatoid factor (Docket No. 12, pp. 475-476 of 483).

C.    CONSULTATIVE EXAMINATIONS

1.    REGINA MCKINNEY, PSY.D.

On December 17, 2010, Plaintiff was referred for a clinical interview with Dr. McKinney by the Bureau of Disability Determination to assess his mental status (Docket No. 12, p. 448 of 483).  Dr. McKinney's findings reflected that:  Plaintiff's appearance was adequate and that  he appeared irritable but  had adequate remote recall, attention and concentration with limited short-term memory skills and low to average intelligence (Docket No. 12, p. 452 of 483).  Plaintiff's symptom severity was rated between 41 and 50 with symptomatology suggestive of post-traumatic stress disorder (Docket No. 12, p. 452 of 483).  Plaintiff's functioning was assessed as falling between 51-60, but he was assessed an overall Global Assessment of Functioning (GAF) score of 50, which is consistent with serious symptoms[24] (Docket No. 12, p. 452 of 483).  Citing Plaintiff's emotional difficulties, Dr. McKinney rated Plaintiff's abilities to relate to others including co-workers and supervisors as markedly impaired, to   understand, remember, and follow simple instructions as moderately impaired, to maintain attention, concentration, persistence, and pace as mildly impaired, and to withstand the stress and pressure associated with day-to-day work activity as markedly impaired (Docket No. 12, pp. 452-453 of 483).

2.    WILFREDO M. PARAS, M.D.

On December 10, 2010, Plaintiff was referred to Dr. Paras for an internal medical disability evaluation by

---

[23]  Naproxen is prescribed to relieve pain from headaches, muscle aches, swelling and joint stiffness caused by arthritis. *Naproxen oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (July 22, 2014, 11:33 AM), http://www.webmd.com/drugs/mono-1289-NAPROXEN+-+ORAL.aspx?drugid=5173&drugname=naproxen+oral.

[24]  A GAF score within the 50-41 range is for serious symptoms or any serious impairment in social, occupational, or school functioning. *GAF Index*, UNIV. OF WASH., (July 28, 2014, 9:06 AM), https://depts.washington.edu/washinst/Resources/CGAS/GAF%20Index.htm.

the Bureau of Disability Determination (Docket No. 12, p. 456 of 483).  Dr. Paras opined that Plaintiff's ability

to perform work-related physical and mental activities appeared to be severely limited due to his head injury, left

upper arm injury, chronic back pain, arthritis of both hands, and Bipolar Disorder with Depression.  Dr. Paras

indicated Plaintiff's general work limitation is less than sedentary (Docket No. 12, p. 457 of 483).  An x-ray

ordered by Dr. Paras of Plaintiff's lumbar spine noted mild dextroscoliosis[25] of the lumbar spine that could be

positional or due to muscular spasm (Docket No. 12, p. 458 of 483). A manual muscle testing form reflects that

Plaintiff had "good" muscle strength in both his right and left sides, but noted pain in Plaintiff's left shoulder and

elbow.  Dr. Paras documented pain in both of Plaintiff's hands during grasp testing, and limited range of motion

in his extremities (Docket No. 12, pp. 459-462 of 483).   Dr. Paras also notes pain in Plaintiff's lower back and

the left side of his body (Docket No. 12, p. 462 of 483).

### III.  STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an

adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*,

2014 WL 916945, *2 (N.D. Ohio 2014).   At step one, a claimant must demonstrate she is not engaged in

"substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th

Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  At step two, the claimant must show that

she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730.   A "severe impairment" is one which

"significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923).

At step three, the claimant must demonstrate that her impairment or combination of impairments meets or

medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §

416.920(d) (West 2014).  If the claimant meets her burden she is declared disabled, however, if she does not, the

---

[25]  Dextroscoliosis is a term used to describe spinal curve to the right.  *Scoliosis Types*, SPINE-HEALTH,
(July 22, 2014, 11:38 AM), http://www.spine-health.com/conditions/scoliosis/scoliosis-types.

Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 416.945(a) (West 2014).  In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014).  At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014).  Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b),  416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  While the claimant has the burden of proof in steps one through four.  The Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

13

## IV. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Prinsloo made the following findings:

1.  Plaintiff has not engaged in substantial gainful activity since June 22, 2010, the application date.

2.  Plaintiff has the following severe impairments: degenerative joint disease and a depressive disorder.

3.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, the undersigned finds that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except he cannot climb ladders, ropes or scaffolds or work at unprotected heights.  He is limited to occasional fine manipulation with his hands bilaterally.  He is limited to simple, repetitive tasks and low stress work that involves no more than limited interaction with coworkers and no interaction with the public.

5.  Plaintiff is unable to perform any past relevant work.

6.  Plaintiff was born on November 23, 1957 and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.

7.  Plaintiff has at least a high school education and is able to communicate in English.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not Plaintiff has transferable job skills.

9.  Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10. Plaintiff has not been under a disability, as defined in the Act, since June 22, 2010, the date the application was filed.

(Docket No. 12, pp. 12-28 of 483).

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).

14

On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)).  "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance."  *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. Discussion

### A.    Plaintiff's Allegations

Plaintiff alleges that the ALJ erred by failing to: (1) include a limitation for Plaintiff's ability to handle bilaterally; and (2) appropriately weigh the opinions of consultative examiners Dr. McKinney and Dr. Paras (Docket No. 16).

### B.    Defendant's Response

Defendant disagrees with Plaintiff's assignments of error and argues that the evidence Plaintiff cites does not support a bilateral handling limitation (Docket No. 17, pp. 5-9 of 14).  Defendant also argues that the weight

the ALJ assigned to the opinions of Dr. McKinney and Dr. Paras was appropriate and supported by substantial evidence (Docket No. 17, pp. 9-12 of 14).

**C.    ANALYSIS**

      **1.    DID THE ALJ ERR BY FAILING TO FIND A BILATERAL HANDLING LIMITATION**

Plaintiff challenges the ALJ's residual functional capacity (RFC) findings at step-four in his analysis and argues that the ALJ should have assessed him as having a limitation for bilateral handling as a result of his left arm injury accompanied by persistent pain and weakness (Docket No. 16, pp. 7-8 of 16).  To support this assertion, Plaintiff cites an April 2011 examination, Dr. Paras' consultative examination findings, an August 2011 examination, and his own testimony concerning his ability to lift, grab, and grasp items (Docket No. 16, pp. 7-9 of 16).  Defendant disagrees that the evidence Plaintiff cites supports a bilateral handling limitation and points out that neither of the reviewing state agency physicians assigned Plaintiff such a limitation (Docket No. 16, p. 9 of 14).

In evaluating a claimant's RFC, the ALJ is required to consider all of the relevant evidence, including the objective medical evidence and statements from the claimant concerning the effects of their symptoms.  20 C.F.R. § 416.945 (West 2014); SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996) (West 2014).  A claimant cannot be found disabled based upon symptoms alone; instead, there must be medical evidence establishing the existence of a medically determinable impairment reasonably expected to produce the claimant's symptoms.  20 C.F.R. § 416.929 (West 2014); SSR 96-7P, 1996 WL 374186 at *1 (July 2, 1996)(West 2014).  When such evidence exists, the intensity, persistence, and functionally limiting effects of the claimant's symptoms must be evaluated to determine the extent those symptoms impact the claimant's ability to work. *Id.*

ALJ Prinsloo's RFC analysis comprises nine of his seventeen page decision and includes a detailed summary of the evidence, his credibility findings and rationale (Docket No. 12, pp. 17-26 of 483).   All of the evidence Plaintiff cites in support of his claim is included in the ALJ's RFC analysis  (Docket No. 12, pp. 20-22

of 483).  Among the evidence Plaintiff cites is an examination with North Coast Health Ministry on April 1, 2011, which he contends found decreased strength in his left upper extremity (Docket No. 16, p. 8 of 16).  After reviewing the record, the undersigned Magistrate notes that the record contains no such finding, but instead reflects that Plaintiff complained of neck pain radiating down to his left arm without weakness, which is consistent with the ALJ's summary of the treatment record (Docket No. 12, pp. 21 and 482 of 483).  On examination, Plaintiff's review of symptoms documented that he had left arm numbness, but does not otherwise detail any weakness or limitations in Plaintiff's ability to use his hands (Docket No. 12, pp. 482-483 of 483).

Next, Plaintiff cites his dynamometer[26] testing results from his consultative examination with Dr. Paras, finding  that Plaintiff had decreased strength in both hands and that his right hand was stronger than his left (Docket No12, pp. 457; 459 of 483).  ALJ Prinsloo's decision includes a summary of Dr. Paras' findings in his RFC analysis, but ultimately the ALJ afforded Dr. Paras' opinions little weight (Docket No. 12, pp. 22-23; 25 of 483).  With respect to Dr. Paras' findings concerning Plaintiff's arthritis, the ALJ observed that Dr. Paras' "only specific physical finding" was his observation of "Heberden's nodes, consistent with arthritis of the hands" (Docket No. 12, p. 25 of 483).  Dr. Paras' consultative examination findings do not otherwise render an opinion concerning Plaintiff's specific limitations for using his hands, but instead conclude that all of Plaintiff's physical and mental symptoms limit him to less than a sedentary level of work (Docket No. 12, p. 457 of 483).

Aside from Dr. Paras' report, the only other medical record of his arthritis pain, which Plaintiff also cites, is an examination at  Northcoast Health Ministry dated August 31, 2011 (Docket No. 12, pp. 477-478 of 483).  During that evaluation, Plaintiff reported chronic pain in his hands and that he has severe arthritis (Docket No. 12, p. 477 of 483).  On examination, Plaintiff was found to have profound DIP and PIP joints (Docket No. 12, p.

---

[26]  A hand dynamometer is used to test hand grip strength and is also used to test a patient's comparative strength in their left and right arms. *Hand Dynamometers for Grip Strength Testing and Physiology Research*, PROHEALTHCAREPRODUCTS.COM, (July 22, 2014, 11:26 AM), http://prohealthcareproducts.com/hand-dynamometers-c-2.

478 of 483).  Plaintiff's evaluating medical provider diagnosed him with chronic pain syndrome and arthritis, but the results of an arthritis panel from October 14, 2011, revealed that Plaintiff was not positive for a Rheumatoid Factor (Docket No. 12, pp. 477-478; 476 of 483).

Finally, Plaintiff offers his hearing testimony describing his inability to lift and grab household items including a gallon of milk or a cup of coffee, to argue that there is substantial evidence a bilateral holding limitation should have been assessed.   ALJ Prinsloo, however,  found that the medical evidence, Plaintiff's allegations and his testimony, severely undermined Plaintiff's credibility (Docket No. 16, p. 8 of 16; Docket No. 12, p. 24 of 483).   This finding is exemplified  by the record of Plaintiff's arthritis and complaints of pain in his hands, which is first detailed in Dr. Para's examination report in 2010  (Docket No. 12, pp. 456-457 of 483). Plaintiff's medical records predating his examination with Dr. Paras, which repeatedly documented Plaintiff's medical history as being negative for arthritis (Docket No. 12, pp.  437-438; 403; 391; 375 of 483).   In August 2007, Plaintiff was documented as having normal motor strength in all muscle groups (Docket No. 12, p. 331). There is no evidence that Plaintiff has suffered from pain and arthritis in his hands for "years" as noted in Dr. Paras' examination report (Docket No. 12, pp. 456-457 of 483).  Even if Plaintiff could establish the longstanding arthritis diagnosis he claims, an arthritis diagnosis by itself, is silent concerning the impact or severity of the impairment on the Plaintiff's work capabilities. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition").  Plaintiff has not met his burden of presenting medical evidence to demonstrate his need for a bilateral handling limitation.

For the foregoing reasons, the ALJ's decision not to assess a bilateral handling limitation is supported by substantial evidence.

## 2. IS THE ALJ'S EVALUATION OF THE CONSULTATIVE EXAMINERS' OPINIONS SUPPORTED BY SUBSTANTIAL EVIDENCE

In his second assignment of error, Plaintiff alleges that the ALJ failed to properly weigh the opinions of

18

consultative examiners Dr. McKinney and Dr. Paras (Docket No. 16, p. 9 of 16). Plaintiff maintains that the consultative examiners' opinions are consistent with each other and the record; and therefore, should have been given greater weight than the non-examining state examiners' opinions (Docket No. 16, pp. 11-12 of 16). Plaintiff argues that the ALJ's decision to reject Dr. McKinney's opinion on the basis of Plaintiff's subjective reports undermines her professional ability to render mental assessments and defeats the purpose of the consultative examinations (Docket No. 16, pp. 10-11 of 16). Plaintiff also contends that the ALJ's assessment of Dr. Paras' findings are inaccurate, insisting that Dr. Paras' opinion is based on his examination and consistent with the objective evidence (Docket No. 16, pp.11-14 of 16). Defendant disagrees and argues that the ALJ's evaluation of the medical opinions of Dr. McKinney and Dr. Paras are supported by substantial evidence (Docket NO. 17, pp. 9-12 of 14).

The regulations describe a hierarchy for evaluating medical opinions. *See* 20 C.F.R. § 416.927(c) (West 2014). "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source") . . . and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013)(citation omitted). The opinions of consultative examiners are classified as "nontreating sources," whereas the opinions of state agency consultants are classified as "nonexamining sources," however; both are evaluated applying the factors set forth in § 416.927(c)(2). *See* 20 C.F.R. §§ 416.902, 416.927(c), (e) (West 2014).

### a.      Dr. McKinney

ALJ Prinsloo's decision clearly reflects his consideration of the § 416.927(c)(2) factors in his evaluation of Dr. McKinney's opinions. ALJ Prinsloo referenced Plaintiff's evaluation with Dr. McKinney as a consultative examination (treatment relationship), recognized that Dr. McKinney is a psychologist (specialization), and

concluded that her findings were poorly explained and poorly supported by the evidence (supportability and consistency)(Docket No. 12, pp. 24-25 of 483). For those reasons, ALJ Prinsloo indicated that he gave Dr. McKinney's opinion limited weight, crediting her findings only to the extent they support limitations for Plaintiff in social functioning and his ability to maintain attention, concentration, persistence and pace (Docket No. 12, p. 25 of 483). Upon review of Dr. McKinney's examination report, the undersigned Magistrate notes that Plaintiff's history of mental health symptoms and Dr. McKinney's findings are based on Plaintiff's subjective reports uncorroborated by objective medical evidence.

Throughout the record, Plaintiff repeatedly reports having been diagnosed with Bipolar Disorder and Depression, but those claims ARE unsubstantiated by a diagnosis from a psychiatric treatment provider or objective medical evidence. While Plaintiff cites a January 2007 examination reporting Beck Inventory and McGill scores significant for depression, both tests are subjective (Docket No. 16, p. 11 of 16). The Beck Inventory Test is a multiple choice questionnaire for depression which is completed by the patient while the McGill test is similarly used by patients to rate their pain.[27] Dr. Rahman's treatment notes do not contain any other basis for his mental health diagnosis (Docket No. 12, pp. 356-358 of 483). Plaintiff also cites his April 2011 examination with North Coast Health Ministry, which noted that Plaintiff reported a history of depression and anxiety and observed that he had flat effect and poor eye contact during his examination (Docket No. 12, pp. 482-483 of 483). Interestingly, Plaintiff's later dated medical records with North Coast Health Ministry do not include either an anxiety or depression diagnoses, but indicates that Plaintiff showed improved effect and eye contact on examination in May 2011 (Docket No. 12, pp. 477-478; 479-480 of 483). If Plaintiff's symptoms are resolved with treatment, they cannot be a basis for disability finding. *See Harris v. Heckler*, 756 F.2d 431, 435 n. 2 (6th

---

[27] *See CBT Tests*, BECK INST., (July 15, 2014, 1:24 PM), http://www.beckinstitute.org/beck-inventory-and-scales/; Carol S. Burchhardt & Kim D. Jones, *Adult Measures of Pain*, ARTHRITIS CARE & RESEARCH, Oct. 30, 2003, at S96, *available at* http://onlinelibrary.wiley.com/doi/10.1002/art.11440/pdf.

Cir. 1985).

The undersigned Magistrate also observes, consistent with the ALJ's decision, that Dr. McKinney's findings are based on Plaintiff's subjective statements rather than medical records or objective findings.  Dr. McKinney's examination report implies as much in her disclaimer, which qualifies that her opinion is based on the information available to her at the time of her evaluation and that "[a]dditional information could result in alternative conclusions" (Docket No. 12, p. 448 of 483).  In the section of Dr. McKinney's report detailing Plaintiff's statements concerning his mental health symptoms, Dr. McKinney specifically notes that there "were no medical reports available for review" (Docket No. 12, pp. 448-449 of 483).  Without the benefit of reviewing any of Plaintiff's medical records, Dr. McKinney's report reflects her considerable reliance on Plaintiff's statements as the basis for her opinions concerning his mood and affect, anxiety, mental content, activities of daily living, and GAF scores (Docket No. 12, pp. 451-453 of 483).

In light of Plaintiff's considerable credibility issues and Dr. McKinney's reliance on Plaintiff's statements as the basis for her findings, the undersigned Magistrate finds the ALJ's evaluation of Dr. McKinney's opinions and decision to afford them limited weight is supported by substantial evidence.

**b.     Dr. Paras**

Dr. Paras' opinion is also that of a  "nontreating source" and ALJ Prinsloo's decision reflects his consideration of the applicable § 416.927(c)(2) factors.  Dr. Paras noted that Plaintiff underwent a consultative examination with Dr. Paras (treatment relationship), summarized Dr. Paras findings, and ultimately concluded that Dr. Paras' opinion offered a historical analysis, was poorly explained and poorly supported (supportability) by his own findings (Docket No. 12, p. 25 of 483).  After having reviewed Dr. Paras' examination report, the undersigned Magistrate observes that Dr. Paras' history of present illness section is based entirely on Plaintiff's subjective claims concerning symptoms and past diagnosis (Docket No. 12, p. 456 of 483).  Furthermore, Dr. Paras' findings are supported by almost no objective medical evidence (Docket No. 12, pp. 456-457 of 483).

21

For example, Plaintiff reported to Dr. Paras that he had been diagnosed with "mental disorder consisting of [D]epression and [B]ipolar [D]isorder in early 2000 by his primary care physician." The record, however, contains no medical evidence that Plaintiff was ever diagnosed with Bipolar Disorder or was formally diagnosed for Depression (Docket No. 12, p. 456 of 483).  Plaintiff also reported suffering from chronic back pain, but failed to accurately disclose his work history to Dr. Paras (Docket No. 12, p. 456 of 483).  While Plaintiff indicated to Dr. Paras that he last worked waterproofing in 1999, Plaintiff testified that he worked performing odd jobs including house painting and landscaping sometime between 2007 and 2009, which is work requiring medium to heavy levels of physical exertion (Docket No. 12, pp. 63; 456 of 483). *See generally Laborer, Landscape*, DICOT 408.687-014, 1991 WL 673364 (West 2014); *Painter*, DICOT 840.381-010, 1991 WL 681836 (West 2014).  Moreover, the objective medical record of Plaintiff's back pain is sparse and consists of a single x-ray ordered by Dr. Paras, which revealed mild dextroscoliosis of the lumbar spine (Docket No. 12, p. 458 of 483). Finally, as highlighted in the previous section, Plaintiff's claims about suffering from arthritis for "years" is also inconsistent with the medical records as a whole and sparsely supported by objective medical evidence.

The regulations provide that "the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give the opinion. 20 C.F.R. § 416.927(c)(3) (West 2014).  The undersigned Magistrate finds the objective medical evidence presented by Dr. Paras to support his findings is limited, unsupported by his findings, inconsistent with the rest of the medical record, and dependent upon Plaintiff's subjective statements.  Therefore the undersigned Magistrate finds the ALJ's determination to afford Dr. Paras' findings little weight is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: August 6, 2014